1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                       **DISTRICT OF NEVADA**

10

11   UNITED STATES OF AMERICA,        )        2:06-cr-00310-HDM-PAL
                                      )        2:12-cv-00851-HDM
12                                    )
               Plaintiff/Respondent,  )
13   vs.                              )        ORDER
                                      )
14   JOSEPH HALL,                     )
                                      )
15                                    )
               Defendant/Petitioner.  )
16   _____)

17        Before the court is defendant Joseph Hall's ("Hall") motion to

18   vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255

19   (#237).  The government has responded (#257), and Hall has replied

20   (#264).  Hall has also filed a supplement to his petition (#280),

21   to which the government has responded (#284), and Hall has replied

22   (#285).

23   **Factual History**

24        The following evidence was adduced at the trial of this

25   matter.

26        On August 15, 2006, a confidential informant ("CI") working

27   with undercover officer Eric Calhoun ("Calhoun") arranged over the

28   phone, in Calhoun's presence, to buy from Hall three ounces of

                                       1

cocaine for $1,500.00.  (Trial Tr. 35-36, 53-56).  After changing the exchange location multiple times (Trial Tr. 45-46, 48, 50-51, 53), Hall called the CI and said he left the cocaine at 725 Wardelle Street, Las Vegas, NV – the house of the CI's girlfriend. (Trial Tr. 53).  The CI and Calhoun went to 725 Wardelle, and while Calhoun waited outside, the CI went inside and returned with three ounces of cocaine.  (Trial Tr. 55-56).  Calhoun and the CI then waited outside of 725 Wardelle for Hall.  (Trial Tr. 60).  Hall arrived wearing a hat that was blue in the back and white with a blue A in the front.  (Trial Tr. 66; Trial Ex. 6).  Calhoun observed the CI give Hall $1,500.00.  (Trial Tr. 61-62).  The men then discussed future drug transactions, and Hall gave Calhoun permission to contact him directly.  (Trial Tr. 64).  The transaction was captured on video.  (*See* Trial Tr. 56-58; Trial Ex. 6).

That same date, Hall was traced to the parking lot of Extended Stay of America on 4240 Boulder Highway in Las Vegas.  (Trial Tr. 170).  On August 18, 2006, Las Vegas Metropolitan Police Department ("LVMPD") detective Anton Gorup set up surveillance at the Extended Stay.  (Trial Tr. 171).  Gorup eventually located Hall inside of apartment 3201.  (Trial Tr. 172).

On August 22, 2006, Hall agreed over the phone to sell Calhoun "the same thing" – three more ounces of crack cocaine for $1,500. (Trial Tr. 38, 73, 77).  Later that day, Calhoun and Hall met at 725 Wardelle and consummated the transaction.  (Trial Tr. 78, 88).

The same day, Gorup conducted surveillance of apartment 3201. (Trial Tr. 158, 172-73).  During that time, Gorup observed a woman enter and exit the apartment several times; each time she returned,

2

she knocked to reenter. (Trial Tr. 174). Gorup also observed Hall leave the apartment multiple times; each time Hall returned, he used a key to reenter. (Trial Tr. 174-76).

On August 23, 2006, Gorup returned to execute a search warrant of apartment 3201. Before going in, he observed Hall and two women leave the apartment. (Trial Tr. 179-80). The three were taken into custody in the parking lot, and the search warrant was then executed. (Trial Tr. 180). Inside were found two glass measuring cups, a silver spoon and a digital scale with white residue, sandwich baggies, and two bags hidden in a couch, one containing cash and the other containing individually wrapped one-ounce pieces of crack cocaine. (Trial Tr. 183, 185-86). In addition, the detectives found large men's shoes, large men's blue jeans, and a blue and white hat with an A on the front like the one Hall had been seen wearing. (Trial Tr. 186-87). Gorup also testified that detectives recovered miscellaneous paper work in Hall's name. (Trial Tr. 190; Trial Ex. 13). In total, detectives found $6,822.00 in the apartment. Based on the serial numbers, they were able to determine that $220.00 of the $6,822.00 were bills Calhoun had given Hall to purchase cocaine. (Trial Tr. 188-89).

On Hall's person when he was arrested was the cell phone the CI and Calhoun had called to arrange the drug transactions. (Trial Tr. 190).

Apartment 3201 had been rented in the name of "something similar" to "Mary Kershon" and paid for in cash. (Trial Tr. 211, 220). In Gorup's experience and training, persons engaged in criminal activity usually do not put rentals in their own names in order to avoid detection. (Trial Tr. 220).

**Procedural History**

On August 29, 2006, the grand jury returned an indictment against Hall charging him with three counts of possession with intent to distribute and distribution of a controlled substance: Count 1 for the August 15, 2006, incident, Count 2 for the August 22, 2006, incident, and Count 3 related to the August 23, 2006, search of apartment 3201. (Doc. #1). Michael Sanft was appointed to represent Hall. (Doc. #4).

On March 5, 2007, just before trial was set to begin, Hall raised concerns about Sanft's representation. (Doc. #169). The court relieved Sanft as counsel and ordered the Federal Public Defender's Office be appointed to represent Hall. (*Id.*) Trial was reset for a later date. (*Id.*)

On December 12, 2007, just before trial was set to begin for the second time, the Public Defender's Office was relieved as counsel, Jacqueline Naylor was appointed to represent Hall, and trial was reset for a later date. (Doc. #79 & #80).

On March 19, 2008, Hall filed a letter with the court again expressing concern about his representation by all attorneys, including Naylor. (Doc. #85). On April 2, 2008, Hall retained G. Luke Ciciliano. (Doc. #91). The court granted Hall's motion for substitution of counsel. (Doc. #92).

On May 1, 2008, Ciciliano filed a motion to suppress all evidence seized on August 23, 2006. (Doc. #98). Ciciliano argued that the search warrant obtained by Officer Gorup lacked probable cause because it implied the August 15, 2006, transaction took place at apartment 3201, alleged to be Hall's residence, when it actually took place at 725 Wardelle. *See id.* Following

4

evidentiary hearings on May 13, 2008, and June 6, 2008, the court denied the motion.  (Doc. #104 & #110).

Trial commenced on June 11, 2008.  On June 12, 2008, the jury returned guilty verdicts on all three counts.  (Doc. #117).  The jury found that each count involved 50 grams or more of a mixture or substance containing a detectable amount of cocaine base.  *Id.*

Following trial, Ciciliano filed a motion to withdraw as counsel.  (Doc. # 122).  On that same date, Hall filed a *pro se* motion for new trial.  (Doc. #123).  The court granted the motion to withdraw and appointed Todd Leventhal to represent Hall.  (Doc. #128 & #129).  The court gave Leventhal two weeks to review and file any supplements to Hall's motion for new trial.  (Doc. #129). Leventhal did not file any supplement.  On October 23, 2008, the court denied Hall's motion, holding in relevant part:

> [T]he defendant's primary contention is that he received ineffective assistance of counsel. As to matters that occurred at trial the court concludes that the defendant has failed to establish that his counsel's representation fell below an objective  standard of reasonableness.  As to other ineffective assistance claims, the record is insufficiently developed to evaluate the claims. Such claims should be raised on collateral review under . . . § 2255.

(Doc. #137).

On January 8, 2009, the court granted Hall's request to represent himself at sentencing and appointed Leventhal as standby counsel.  (Doc. #141).  On May 14, 2009, the court sentenced Hall to three concurrent terms of life imprisonment pursuant to 21 U.S.C. § 841 and the career offender provisions of the United States Sentencing Guidelines.  (Doc. #161 & 164).

Hall appealed his conviction on Count 3 of the indictment and his sentence on all three counts.  Mario Valencia was appointed to

5

represent Hall on appeal. (Doc. #163).  On November 10, 2010, the
Ninth Circuit affirmed the court's sentence and judgment of
conviction.  (Doc. #228).

On May 14, 2012, Hall timely filed the instant motion pursuant
to 28 U.S.C. § 2255.  Although Hall filed his reply on February 25,
2013, Hall requested the court hold in abeyance its decision on his
petition pending its rulings on motions for discovery and for leave
to supplement.  (Doc. #262, #264).  In addition, Hall's reply
contained new arguments, one of which the court determined there
was good cause to consider: Hall's claim that Ciciliano rendered
ineffective assistance of counsel by failing to sufficiently
discuss the government's plea offer with him before trial.  On
April 15, 2013, the court ordered the government to respond to that
argument.  (Doc. #272).  The government filed its response on April
24, 2013.  (Doc. #275).

On April 18, 2013, the court granted in part and denied in
part Hall's motion for discovery.  (Doc. #274).  The court directed
the government and Hall's former attorneys to provide Hall with
certain documents on or before May 20, 2013, including the proposed
plea agreement in effect when Hall went to trial.  (*Id.*)  Following
that deadline, the court ordered Hall to file any request to
supplement his § 2255 motion on or before June 21, 2013. (Doc.
#277).

On June 14, 2013, Hall filed a motion asserting that the
government had not yet produced the proposed plea agreement.  On
June 17, 2013, the government filed with the court and served on
Hall the plea offer that was in effect at the time Hall went to
trial.  (Doc. #281).

6

Hall also filed a motion to amend his § 2255 petition, along with the proposed supplement. (Doc. #278 & #280). The court granted Hall leave to amend. The government timely filed a response to the supplement, and Hall has replied. The matter now stands submitted.

**Standard**

A convicted defendant may move to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, if: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. *Id.* § 2255(a); *see also United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010).

**Analysis**

**I.  Ineffective Assistance of Counsel – Trial Counsel Ciciliano**

Ineffective assistance of counsel is a cognizable claim under § 2255. *Baumann v. United States*, 692 F.2d 565, 581 (9th Cir. 1982). In order to prevail on a such a claim, Hall must satisfy a two-prong test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, Hall must show that his counsel's performance fell below an objective standard of reasonableness. *Id.* at 687-88. "Review of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1986). Second, Hall must show that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. This requires showing that "there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Harrington v. Richter*, – U.S. –, 131 S. Ct. 770, 787-88 (2011) (internal citations and punctuation omitted).

As an initial matter, Hall argues that he is not required to demonstrate prejudice in connection with any of his ineffective assistance claims as Ciciliano was effectively "completely missing" from his trial. *United States v. Cronic*, 466 U.S. 648 (1989). The court finds this contention to be without merit. Ciciliano was present at trial and advocated on Hall's behalf.

Hall argues Ciciliano rendered ineffective assistance by: (1) striking all minority jurors; (2) failing to investigate and call exculpatory witnesses; (3) failing to object to the lack of testimony from the CI; (4) failing to object to Hall's shackles and the seating arrangement; (5) failing to request a "missing witness" instruction; (6) failing to investigate the facts and law of the case; (7) improperly referring to the nickname "Pussylips" during his closing statement; (8) failing to secure an "aiding and abetting" instruction; and (9) failing to provide and discuss the government's proposed plea offer with Hall before trial.[1]

---

[1] Hall raises several new arguments in his reply, which with the one exception noted above the court declines to consider. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

A. <u>Striking of Minority Jurors</u>

Hall argues that Ciciliano struck all minority jurors from the jury panel in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The government argues that Hall cannot raise a *Batson* challenge to his own counsel's actions, and that even if he could, Ciciliano's affidavit states that he struck the jurors based on race-neutral reasons. (*See* Doc. #257 (Gov't Opp'n (Ciciliano Aff. ¶ 11)).

Hall's argument is unusual in that he is not challenging another party's use of peremptory strikes. And as the government correctly points out, none of the cases Hall cites involve a challenge by a defendant to his own attorney's conduct. *See Georgia v. McCollum*, 505 U.S. 42 (1992) (challenge by prosecutors to defendants' racially based peremptory strikes); *United States v. Huey*, 76 F.3d 638 (5th Cir. 1996) (challenge by defendant to co-defendant's use of racially based peremptory strikes); *Walters v. Mitchell*, 2002 U.S. Dist. LEXIS 13666 (E.D.N.Y. 2002) (defendant argued the trial court erred in finding two of his peremptory strikes were racially motivated).

Even if Hall were able to challenge his own counsel's actions on collateral review, Hall did not raise any *Batson* challenge at his trial, and "an objection at trial is a prerequisite to a *Batson* challenge for purposes of habeas review." *Haney v. Adams*, 641 F.3d 1168, 1173 (9th Cir. 2011). In *Haney*, the Ninth Circuit explained that the Supreme Court's *Batson* procedure "presupposes . . . a timely objection to the challenges during voir dire," and the determinations that must be made by the court in conducting a *Batson* analysis would be "difficult, if not impossible, to evaluate for the first time in post-conviction proceedings when no record is

preserved." *Id.* at 1172. While *Haney* involved a state habeas petition challenging the prosecutor's use of peremptory strikes, as opposed to a federal petition challenging defense counsel's actions, the court finds that neither of these factors is dispositive. The reason for requiring a contemporaneous *Batson* objection in order to preserve the claim for collateral review applies with equal force to this case. The record amply reflects that Hall frequently raised issues on his own, including a *pro se* motion for a new trial (#123 & #150) that did not contain any *Batson* argument. The absence of a contemporaneous objection bars a defendant's *Batson* challenge on collateral review.[2] Accordingly, under *Haney v. Adams*, Hall's Batson challenge must fail.

B. <u>Failure to Investigate and Call Exculpatory Witnesses</u>

An attorney is ineffective for failing to introduce evidence demonstrating his client's factual innocence or evidence that "raises sufficient doubt as to that question to undermine confidence in the verdict." *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002). An attorney is also ineffective if he fails "to conduct a reasonable investigation" or to "make a showing of strategic reasons for failing to do so." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

Hall argues that Ciciliano failed to investigate and call several exculpatory witnesses: (1) Mary Kirkhom; (2) Lavot McDaniel; (3) Ebony Cook; (4) LeKrystal Cardenas; (5) Mike Edwards; (6) Dalichia Finks; (7) Courtney White; (8) Ronisha White; and (9)

---

[2] There is no merit to Hall's contention that when the government said it was *not* raising a *Batson* challenge, it effectively raised such a challenge.

Glen Meeks.  The government argues that Ciciliano tried to contact
several of the above-named witnesses "on numerous occasions" by
telephone but could not reach them and Hall could not give him
their physical addresses.  (Gov't Opp'n (Ciciliano Aff. ¶¶ 4, 5 &
7)).  The government further argues that even if the witnesses were
available and willing to testify, Ciciliano was not deficient for
failing to call them to offer likely perjured testimony in light of
the overwhelming evidence of Hall's guilt.  Hall replies that he
did give Ciciliano the witnesses' contact information and that
Ciciliano has not provided any notes or documents to prove that he
investigated the case.  Hall attaches to his reply a number of
documents showing addresses for several of the witnesses.

Without deciding whether Ciciliano could have located the
witnesses, Hall has failed to establish that the failure to call
any one of them prejudiced his defense.

i. Mary Kirkhom

Kirkhom's affidavit states that she would have testified that
the clothes and papers found in apartment 3201 and depicted in the
photographs introduced at trial were not Hall's, that she and not
Hall rented out apartment 3201, and that Hall did not occupy
apartment 3201 or ever have a key to it.[3]  (Def. Mot. App'x 1
(Kirhom Aff.)).

Kirkhom's testimony would not have demonstrated Hall's factual
innocence or raised doubt as to his guilt.  Regardless of who
rented the apartment, abundant evidence demonstrated that Hall had

---

[3] Hall asserts that Kirkhom would have testified that the drugs found
in 3201 were not his and that another male resided in apartment 3201 with
herself and Cardenas.  Kirkhom's affidavit contains no such statements.

access to it.  Gorup observed the man he later identified in court as Hall exiting and entering the apartment with a key several times.  Kirkhom's assertion that Hall never had a key to the apartment does not disprove this, as Kirkhom admits that two keys existed and, although she says she gave the other key to Cardenas, she does not state that she was at all times aware of who had or was using the other key.  Further, regardless of whose clothes and papers were found in the apartment, there was sufficient other evidence collected traceable to Hall, including $220 of the cash given to Hall during the August 22, 2006, transaction.  Finally, to the extent Kirkhom's testimony was intended to suggest that Hall had no access or connection to apartment 3201, such a suggestion is implausible in light of the fact Hall was arrested in the parking lot after exiting the apartment, and was observed exiting and entering it with a key.  Thus even if the jury had heard Kirkhom's testimony, there is no reasonable probability that its verdict would have been any different.

ii. Lavot McDaniel

In his affidavit, McDaniel states that he would have testified that he and Kirkhom resided in apartment 3201, that Hall was not staying in the apartment and never possessed a key thereto, that the clothes, papers, hats, and $1,600 of the cash found therein were his, and that none of the drugs, money, or other items found in the apartment belonged to Hall.  (Def. Mot. App'x 2 (McDaniel Aff.)).[4]

---

[4] Hall also asserts McDaniel would have testified that the "utensil" found in apartment 3201 and depicted in a photograph introduced at trial was his own, but the affidavit contains no such statement.

12

McDaniel does not identify to whom the drugs and paraphernalia that were confiscated from apartment 3201 belonged. Had he testified, McDaniel doubtless would have been asked that question. Whatever his answer, McDaniel would have either inculpated himself, Kirkhom, or Cardenas – the other persons allegedly residing in and having control of the apartment – or, had he testified he did not know, the testimony would have been palpably incredible.

More importantly, however, Ciciliano attests that he tried to contact McDaniel but could not locate him. McDaniel, while saying that he would have testified and that he was never contacted by any of Hall's attorneys, does not state that he could have been contacted or that he was available to testify at the trial. Neither Hall nor McDaniel provides any information proving, or even suggesting, that Ciciliano could have reached McDaniel at the time of trial. Ciciliano could not be ineffective for failing to call a witness he was unable to locate. Hall has therefore failed to establish either deficient performance or prejudice with respect to McDaniel's potential testimony.

### iii. Ebony Cook

Hall argues that Cook also would have testified that Hall did not live or sleep in apartment 3201, did not have a key to the apartment, and did not own the drugs located in the apartment. Cook's affidavit does not say anything about whether the drugs were Hall's, but she does say that she was visiting Cardenas on August 23, 2006, when they and Hall were detained in the parking lot. She goes on to say that Hall did not have a key to 3201, that Cardenas had the key that was confiscated, and that Hall was not an occupant of 3201 between August 18, 2006, and August 23, 2006. However,

Cook does not state how she knows any of these things, especially if, as she says, she was merely visiting Cardenas on August 23, 2006, and not staying herself in 3201. (*See* Def. Mot. App'x 3 (Cook Aff.)). Cook further says that after the raid she helped Cardenas and Kirkhom pack up the apartment and that nothing they packed belonged to Hall. The basis of such knowledge is again unclear. Regardless, this testimony is not reasonably likely to have changed the jury's verdict given the abundant other evidence tying defendant to apartment 3201, including eyewitness identification and $220 of the buy money. Finally, Cook states that she saw Hall in Compton and Los Angeles between August 18, 2006, through August 21, 2006. *Id.* However, this testimony would prove nothing, as it was not impossible for Hall to have been in both places on those dates. *See infra* § I.F.4-5.

> v. Remaining witnesses

Hall has not provided any evidence as to what testimony the remaining witnesses – Cardenas, Edwards, Finks, Courtney White, Ronisha White, and Glen Meeks – would have given. There are no affidavits from these individuals on the record. Further, the court notes that Hall asserts several of these witnesses should have been called to testify that Hall did not deliver drugs to 725 Wardelle on August 15, 2006. However, the lack of any such testimony was not prejudicial. Ciciliano argued to the jury that no one saw Hall leave the drugs in 725 Wardelle and argued that the CI had been convicted of selling drugs. (*See* Trial Tr. 32). Moreover, no one argued or testified that Hall was observed delivering the drugs; rather, the evidence that he did so was Hall's own words, captured on audio recording. (Trial Tr. 53).

The court notes specifically with respect to Mr. Meeks that Hall does not identify what exculpatory information Mr. Meeks would have provided other than the identity of some of the witnesses Hall wanted called.  For the same reasons that the failure to call these witnesses was not deficient, the failure to call Meeks to the stand was also not deficient.

Accordingly, Hall has failed to support his claim that these witnesses would have provided exculpatory evidence at his trial. The court cannot conclude that the failure to call these witnesses prejudiced Hall's defense.

C. Failure to Object to Lack of Testimony from Informant

Hall argues that the government's case was based on information obtained from the CI and that Ciciliano therefore violated his Sixth Amendment Confrontation Clause rights when he did not object to the CI's absence at trial.  The government responds that as the CI's out-of-court statements presented during trial were admitted to provide context, not for their truth, Hall's Sixth Amendment rights were not violated.

The Confrontation Clause bars admission of out-of-court testimonial statements unless the witness is unavailable and the defendant had a prior opportunity to examine him or her.  *Davis v. Washington*, 547 U.S. 813, 823, (2006).  The Confrontation "Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004); *see also United States v. Le*, 172 F. App'x 208, 210 (9th Cir. 2006) (unpublished disposition) (CI's statements did not violate the Clause because they were introduced to provide context, not to prove the truth of their

content); *United States v. Eppolito*, 646 F. Supp. 2d 1239, 1241 (D. Nev. 2009). The CI's statements in this case were not offered for the truth of the matter asserted but rather to provide context to the conversations between the CI, Calhoun, and Hall. The court specifically advised the jury it could not consider the CI's statements for their truth. (Trial Tr. 50, 55). Moreover, it is doubtful that any of the CI's statements were testimonial in nature, as they were uttered to facilitate the controlled buys and not as "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51; *see also United States v. Solorio*, 669 F.3d 943, 952-54 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 109 (2012) (Confrontation Clause not violated by admission of out-of-court statements of DEA agents made while monitoring a drug bust as such statements, made with the "primary purpose other than possible prosecutorial use," were nontestimonial). Accordingly, the admission of the CI's statements at trial did not violate Hall's Confrontation Clause rights. Ciciliano's failure to raise what would have amounted to a nonmeritorious objection therefore was neither deficient nor caused Hall any prejudice. *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

To the extent Hall challenges the fact the CI was not a witness at trial (even without the admission of his out-of-court statements), Hall has cited no case holding that the government must call every witness to a crime. The government was able to prove its case against Hall without the CI's testimony, and it was not required to call the CI to the stand. *See United States v.*

*Ramirez*, 714 F.3d 1134, 1137 (9th Cir. 2013) (recognizing that government may have reasons for not calling a favorable witness). In fact, the CI's testimony would have been largely cumulative of Calhoun's, with the exception of his recovery of drugs from within 725 Wardelle. Such testimony would have been immaterial as Hall's own words established that he had left the drugs inside. In addition, Ciciliano was able to introduce impeaching information about the CI even without his testimony. (Tr. 100, 211-14). Accordingly, any objection to the CI's absence was without merit, and the CI's absence did not prejudice Hall's case.

D. <u>Failure to Object to Shackles and Seating Arrangement</u>

Hall argues that he was visibly shackled and forced to sit several chairs away from his attorneys. He asserts Ciciliano was ineffective for failing to object to his shackles and the seating arrangement.[5]

The Due Process Clause forbids the use of visible shackles during a defendant's criminal trial absent an "'essential state interest' – such as the interest in courtroom security-specific to

---

[5] It is unclear whether Hall is also suggesting that the presence of security personnel violated his right to a fair trial. "The noticeable deployment of security personnel in a courtroom during trial is not an inherently prejudicial practice that requires justification by an essential state interest specific to each trial. Rather, in light of the variety of ways that security guards can be deployed, courts must determine prejudice on a case-by-case basis. In federal habeas corpus proceedings, federal courts reviewing the constitutionality of security personnel used at trial must look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004). To the extent Hall is making such an argument, the presence of a handful of security officers in the courtroom was not "so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." Nor has Hall provided any evidence that he suffered actual prejudice from the presence of the security personnel.

the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624, 626, 632 (2005). Hall argues that the court failed to make specific findings as to why leg restraints were required in this case. However, the reasons for restraints were clear from the record. Moreover, the jury could not see Hall's leg restraints as the table was dressed to hide them. (*See* Trial Tr. 2). There is no evidence that the jury could see Hall's shackles despite the table dressing. The declarations Hall provides contain the observations of individuals sitting in the gallery, not of individuals sitting in the jury box. (*See* Def. Mot. App'x 4-6). As the jury could not see Hall's restraints, Hall cannot show any prejudice. *See Larson v. Palmateer*, 515 F.3d 1057, 1062-63 (9th Cir. 2008); *United States v. Howard*, 480 F.3d 1005, 1013 (9th Cir. 2007); *Williams v. Woodford*, 384 F.3d 567, 592-93 (9th Cir. 2004). Further, Hall has not demonstrated why or how his leg shackles prevented him from communicating with his counsel. Therefore, Hall has not established that being shackled prejudiced his case.[6]

As to the seating arrangement, Hall argues that he was not next to his counsel and that he had to communicate with notes and tapping on the table. Ciciliano, on the other hand, correctly avers that Hall was seated next to him and was not at a separate table. Hall's own diagram confirms that he was seated at the edge

---

[6] In his reply, Hall argues that the shackles prevented him from participating in sidebars and testifying on his own behalf. Hall has not established prejudice on either count. First, there were few sidebars during Hall's trials, and Ciciliano consulted with Hall about each. (Trial Tr. 156). Second, defendant chose not to testify and never informed the court that he made that decision because he was shackled. Should Hall have wanted to testify, arrangements would have been made that ensured the jury could not see his restraints. Ultimately, Hall did not wish to testify, a decision about which the court canvassed him extensively. (Trial Tr. 199-201).

of counsel's table, and that he was near and able to communicate with his attorneys. (*See* Doc. #264 Ex. D). Further, there is no basis for concluding that Hall's position between two tables could have unduly influenced the jury's perception of Hall such that it tainted the verdict. Accordingly, Hall has not shown any prejudice emanating from the seating arrangement, nor did Ciciliano's failure to object to it fall below the standard of reasonable representation.

E. Failure to Request a "Missing Witness" Instruction

Hall argues that because neither the CI nor his girlfriend testified, and because they were the only ones who "observed what happened during the alleged controlled buys" (Def. Mot. 26), his attorney should have requested a "missing witness" instruction. The government responds that a missing witness instruction is not required if the witness is equally available to both parties, and that Hall has not shown the witnesses were unavailable to him. Further, the government argues, Ciciliano made a tactical decision not to call the CI on the grounds that even with the CI's testimony Hall would have been found guilty. (*See* Doc. #257 (Ciciliano Aff. 14)).

As an initial matter, Ciciliano did request a missing witness instruction, although he did not make a formal objection when the court declined to give it. (*See* Doc. #113). However, even absent this, Hall has not established deficient performance.

"A missing witness instruction is appropriate if two requirements are met: (1) [t]he party seeking the instruction must show that the witness is peculiarly within the power of the other party and (2) under the circumstances, an inference of unfavorable

testimony [against the non-moving party] from an absent witness is a natural and reasonable one." *Ramirez*, 714 F.3d at 1137. Hall has not demonstrated either. The CI was not "peculiarly within the power of the" government, as Ciciliano was aware of the CI's identity but made a tactical decision not to call him. Hall has not shown the decision to not call the CI was an unreasonable decision, particularly given that, in light of the CI's cooperation with police, the CI's testimony was likely to have harmed, and not helped, Hall's case. *See Johnson v. Tennis*, 2006 WL 4392562, at *8 (E.D. Pa. 2006) (holding that strategic decision not to call uncooperative witnesses fell within trial counsel's discretion and citing cases in support). Nor, for the same reason, do the circumstances naturally and reasonably suggest the CI's testimony would have been favorable to Hall. Further, while it is unclear whether the CI's girlfriend was available to Hall, her testimony was not necessary to the government's case, as Hall himself told Calhoun and the CI that he had left the cocaine at 725 Wardelle. (Trial Tr. 53, 71-72). Not only that, Hall has not proven that the CI's girlfriend even had relevant testimony to provide. There is thus no "natural and reasonable" inference that the CI's girlfriend's testimony would have been unfavorable to the government. Finally, Hall does not explain why – or present evidence that – the lack of the CI's or his girlfriend's testimony prejudiced his case. Ciciliano pointed out to the jury several times that no one saw Hall leave the drugs in the house. (Trial Tr. 94-99).

F. Failure to Investigate

Hall asserts that Ciciliano failed to sufficiently investigate

his case, and that if he had investigated he would have discovered: (1) that paperwork photographed in apartment 3201 did not have Hall's name on it; (2) that the hand-to-hand transaction between Hall and Calhoun on August 22, 2006, had been recorded, contrary to Calhoun's testimony that it had not; (3) that the hats recovered from apartment 3201 belonged to Lavot McDaniel; (4) court records from Compton in Hall's name dated on August 21, 2006; and (5) a receipt with Hall's signature from California dated August 18, 2006.

     1. Paperwork

At trial, Gorup testified that agents had recovered miscellaneous paperwork in Hall's name from apartment 3201. The paperwork was admitted as Exhibit 13. Hall argues that this testimony was false because the paperwork in Exhibit 13 was actually recovered from his car and not from the apartment, and that paperwork in the apartment was in another's name: Lavot McDaniel. Proof of this, Hall argues, is the fact that one of the photographs taken during the search of apartment 3201 and admitted during trial shows paperwork with McDaniel's name. Hall argues that his attorney was ineffective for failing to notice this and to use it to impeach Gorup's testimony that he found paperwork in Hall's name in apartment 3201.

The government responds that while the photograph indeed has paperwork in McDaniel's name, it never claimed that Hall was in sole possession of the apartment.

As an initial matter, there is no evidence to support Hall's contention that paperwork with his name on it was found only in his car. In fact, Detective Gorup testified under oath that the

documents in Exhibit 13, which had Hall's name on them, had been recovered from apartment 3201. (Trial Tr. 190).

Next, Hall's assertion that Ciciliano was ineffective for failing to discover the discrepancy is without merit. First, there is no reasonable probability the result would have been different had Ciciliano attacked Gorup's credibility in this way. Testimony at trial made it clear that Hall was not the only person who was present in apartment 3201. Gorup did not testify that all paperwork in apartment 3201 was in Hall's name. Further, paperwork in McDaniel's name in the apartment does not foreclose that there was also paperwork in Hall's name therein. Finally, Hall cannot show that any failure prejudiced his defense on Count III, particularly in light of the overwhelming evidence of his access to apartment 3201.

2. Audio Recording

At trial, Calhoun testified that although he was wired for the August 22, 2006, transaction, no audio was available from the time he and Hall went inside 725 Wardelle. There was, however, audio from earlier in the day, of Calhoun and Hall making arrangements over the phone for another sale and of the CI and Hall confirming the details of that transaction. (Trial Tr. 74-78, Exs. 7-A, 7-B-1, 7-B-2). Hall argues that Ciciliano should have impeached Calhoun by challenging Calhoun's assertion because, he argues, a recording of the transaction did exist. Hall asserts he obtained a copy of the recording after trial and attaches as proof a photocopy of two CDs. (#264 (Def. Reply Ex. F)). Hall has not submitted any copy of the alleged recording to the court for verification. Nor has Hall explained how and where he obtained a copy of a recording the

government claims did not exist.

Hall's evidence is not persuasive. First, the photocopies of the CDs contain nothing to indicate they are audio recordings of the August 22, 2006, transaction inside 725 Wardelle. Instead, one of the CDs has the date August 15, 2006, and the other has no date but reads "Calhoun/Gorup." The court cannot conclude on this basis that either CD contains audio from the August 22, 2006 transaction. Moreover, to the extent the second CD is from August 22, 2006, there is nothing to suggest it is different from the August 22, 2006, recordings admitted at trial. (Trial Tr. 74-78, Exs. 7-A, 7-B-1, 7-B-2). Finally, Hall provides no plausible basis for concluding that a recording of the transaction inside 725 Wardelle indeed exists: he has not stated where it came from or how he got it. If Hall obtained the recording from nongovernmental sources (*i.e.*, he recorded the transaction) he certainly cannot fault his attorney for not having a copy. Nor would the copy of the recording have cast any doubt on the officer's testimony, because nothing suggests he was aware of the recording. For those reasons, Hall's claim that Ciciliano should have discovered a recording Hall has not proven exists is without merit.[7] In addition, no evidentiary hearing is required to determine whether the recording exists as Hall's failure to provide any explanation as to how he

---

[7] In his supplement (#280), Hall for the first time argues that a video of the August 22, 2006, transaction exists. As with the audio recording, he does not provide the court with a copy of the supposed video and does not otherwise explain how he procured it, how it was made, or how it would have affected the jury's verdict. In addition, the government did produce a video recording of Hall, Calhoun, and the CI on August 22, 2006, before they entered 725 Wardelle. (Trial Tr. 78-80, 87, Ex. 8). There is no reason to believe the video in Hall's possession is anything other than this recording.

came across such a recording renders his assertion of its existence palpably incredible.

### 3. Hats

Hall argues that Ciciliano should have inspected and had tested for DNA the hats found in apartment 3201. He argues that if he had done so, Ciciliano would have learned the hats had someone else's name and DNA. Hall argues that Gorup falsely testified that the hats belonged to Hall.

While it is possible that had Ciciliano looked into the physical evidence recovered from apartment 3201 he could have argued that some of the objects were not Hall's, the court finds that any failure to do so did not prejudice Hall's defense. The hats were circumstantial evidence that Hall had access to the apartment. There was, in addition to that, an overwhelming amount of direct evidence, including Calhoun's identification of Hall as the person who sold him cocaine on August 22, 2006, and who accepted money in the amount agreed to buy three ounces of cocaine on August 15, 2006, Gorup's identification of Hall as a person who came and went from apartment 3201 several times in the days before he was arrested, and $220 of cash Calhoun used to purchase cocaine from Hall found in the apartment. In light of this evidence, there is no reasonable probability that an argument that the hats did not belong to Hall would have affected the verdict. Further, Ciciliano did not perform deficiently. In fact, he did raise questions during his cross examination of Gorup as to whether the hats actually belonged to Hall. (Trial Tr. 206-210).

Further, the court notes that Gorup never claimed the hats belonged to Hall. Rather, he testified only that they found hats

that looked like the hat Hall had been observed wearing.  There was therefore no reason to focus on proving the ownership of the hats.

### 4. Compton Court Record

Hall argues that Ciciliano should have found and relied on a court record from Compton that would have proven Hall was not in apartment 3201 when Gorup testified he was.  (Def. Mot. 30-31 (App'x 10)).  Ciciliano was not ineffective for failing to rely on this document.  The record Hall cites is file dated August 21, 2006.  At most, this proves Hall filed the document in Compton sometime on August 21, 2006.  However, there was no testimony at trial placing Hall in Las Vegas on August 21, 2006.[8]  Rather, Gorup testified that he saw Hall in apartment 3201 on August 18, 2006, and then again on August 22, 2006.  Given the relatively short distance between Compton, California, and Las Vegas, Nevada, Hall's apparent presence in Compton at some point on August 21, 2006, does not make it impossible for him to have been in Las Vegas – and particularly in apartment 3201 – on the dates Gorup asserted.

### 5. Receipt

Hall argues that Ciciliano should have found a receipt with defendant's signature dated August 18, 2006, from a Diesel Truck repair shop in California.  Hall does not, however, provide any such receipt, nor has he established that Ciciliano would have been able to locate this receipt.  Further, without more, such a receipt would not have contradicted Gorup's statement.  Gorup placed Hall inside apartment 3201 on August 18, 2006, but he did not testify as to what time of day. (Trial Tr. 172).  Even if Hall had been at a

---

[8] While Gorup testified before the grand jury that he observed Hall in apartment 3201 on August 21, 2006, that testimony was not before the jury.

25

truck repair store in California on August 18, 2006, it is not impossible for him to have been at apartment 3201 either before or after that time. Accordingly, Ciciliano was not ineffective for failing to find a receipt that Hall has not established exists. Even if the receipt did exist and could have been located by Ciciliano, there is no reasonable probability that its use at trial would have changed the result.

G. "Pussylips"[9]

Hall argues that during his closing argument, Ciciliano referred to the nickname "Pussylips," heard on some of the recorded conversations. Hall argues that the term had been redacted from both the audio recordings and transcript so Ciciliano's use of it "confused" and "insulted' the jury and made Ciciliano seem like he had "lost his mind." (Def. Mot. 33).

While the record reflects that the term Pussylips was redacted from the transcript of the recording, Hall is incorrect when he argues that it was never heard by the jury. In fact, Pussylips is one of the first words – and one of the last words – on the audio recording introduced as Exhibit 4-A at trial. Accordingly, Ciciliano was not ineffective for referencing and relying on the term during his closing argument.

H. Failure to Secure "Aiding and Abetting" Instruction

Hall argues that Ciciliano should have argued for an aiding and abetting instruction after the jury sent a note asking about

---

[9] Hall's petition challenges Cicilano's failure to object to "the government's witnesses regarding the identification of the person the informant was talking to on the phone." However, Hall discusses only Ciciliano's use of the term "Pussylips" and does not explain why the government witnesses' identification of his voice on the audio recordings was unreliable or erroneous.

facilitation. After receiving the note, the court discussed the issue with counsel, and pondered whether the jury was asking about aiding and abetting. Ultimately, the court determined an aiding and abetting instruction would not be appropriate because no evidence supported such an instruction. An objection by Ciciliano would not have changed this result. Further, a defendant found guilty of aiding and abetting is punishable as a principal. 18 U.S.C. § 2. Therefore, not only did the absence of an aiding and abetting instruction not prejudice Hall's case, such an instruction could itself have been prejudicial as it would have given the jury an additional basis (and not a lesser-included basis) on which to find Hall guilty.

I. Proposed Plea Agreement

Before trial, the government offered Hall a plea agreement. Under the agreement, Hall would have pleaded guilty to Count III of the indictment and would have received an adjustment for acceptance of responsibility. In return, the government would not have pursued a mandatory term of life imprisonment under 21 U.S.C. §§ 841 and 851. (See Doc. #281). While Hall admits he was aware of the government plea offer, and admits that Ciciliano advised him to take it, he asserts that Ciciliano never explained the offer to him and did not allow Hall to read it himself. Hall asserts that the first he heard of the offer was the day before trial when Ciciliano called him on the phone and told him the government was offering between 15 and 18 years. Hall asserts that when he began asking questions about the offer, such as whether the court could still sentence him to life, Ciciliano got angry and refused to discuss the matter further. Finally, Hall argues that Ciciliano never

27

informed him that he could face a life sentence if he went to trial, and that Ciciliano instead told him that the maximum he would face after trial would be thirty years.

Ciciliano asserts that he repeatedly advised Hall to take the plea offer. (Doc. #257 (Ciciliano Aff. ¶¶ 6, 10)). He asserts that when he so advised Hall the day before trial, Hall "insisted that he was 'done taking deals' and that he wished for his case to proceed to trial." (*Id.* ¶ 10). Ciciliano also denies Hall's assertion that he was never provided a copy of the plea agreement; Ciciliano avers that he provided Hall a copy of the agreement the first time they met and that they discussed the agreement in detail. (Doc. #275 (Ciciliano Aff. ¶ 5)). He asserts that "[t]he potential of the plea offer was regularly discussed in my office's meetings with" Hall and that Hall "was emphatic that he would not accept a plea offer." (*Id.* ¶ 6). Finally, Ciciliano asserts that he informed Hall "on numerous occasions of the potential for a life sentence." (Doc. #281 (Ciciliano Aff. ¶ 3); Doc. #284 (Ciciliano Aff.)).

Hall admits that he said he was "done taking deals" (*see* Doc #264 (Def. Reply 24 & 59)), but insists that what he really meant was that he would not sign something he had not read and did not understand. Hall asserts that if the plea agreement had been explained to him, he would have taken it.

Ineffective assistance of counsel claims may be based on alleged deficiencies during the plea bargaining stage. *See Missouri v. Frye*, — U.S. – , 132 S. Ct. 1399 (2012); *Lafler v. Cooper*, – U.S. –, 132 S. Ct. 1376 (2012). Here, however, Hall has not demonstrated ineffective assistance of counsel at the plea

1  bargaining stage.  There is no dispute that Hall told Ciciliano

2  that he was "done taking deals."  There is likewise no dispute that

3  Hall was aware of the nature of the offer: 15-18 years with an

4  agreement to not pursue a mandatory life sentence under § 851. (*See*

5  #264 (Def. Reply 60, 63); *id.* (Hall Decl. ¶ 12)).[10]  While Hall

6  asserts that he did not mean to say he would not take any deals, it

7  was his words, and not what he may have intended by them, that

8  measure whether Ciciliano's reaction to them fell below the

9  standard of reasonable representation.  Hall was aware of the

10  offer, he was aware that it contained an offer of less time than he

11  faced if he went to trial, and he advised his attorney that he was

12  "done taking deals."

13      In addition, the court finds Hall's contention that he did not

14  know he was facing a life sentence if he went to trial is

15  meritless.  Hall's affidavit makes clear he knew he was facing a

16  life sentence. (Doc. #264 (Def. Reply Def. Aff. ¶ 12)).

17      Accordingly, the court concludes that Ciciliano did not render

18  ineffective assistance of counsel in connection with the

19  government's proposed plea agreement to Hall.

20  **II. Other Arguments**

21      All of Hall's remaining arguments are without merit.

22      Further, Hall raises several new arguments in his reply, which

23  with the exception discussed above, the court declines to consider.

24  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The

25

26      [10] The court notes that Hall made these admissions in his reply, which

27  was filed with the court on February 25, 2013.  According to Hall's later
   filings, the first time he saw the proposed plea agreement was sometime

28  after that date, as he claimed on June 14, 2013, that the government had not
   yet served him with a copy of the agreement.

district court need not consider arguments raised for the first time in a reply brief.").

Finally, the court declines to conduct an evidentiary hearing on any of Hall's claims as those claims "viewed against the record, either do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal." *United States v. Burrows*, 872 F.2d 915, 197 (9th Cir. 1989).

## III. Certificate of Appealability

The standard for issuance of a certificate of appealability calls for a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). The Supreme Court further illuminated the standard for issuance of a certificate of appealability in *Miller-El v. Cockrell*, 537 U.S. 322 (2003). The Court stated in that case:

30

> We do not require petitioner to prove, before
> the issuance of a COA, that some jurists would
> grant the petition for habeas corpus.  Indeed,
> a claim can be debatable even though every
> jurist of reason might agree, after the COA has
> been granted and the case has received full
> consideration, that petitioner will not
> prevail. As we stated in *Slack*, "[w]here a
> district court has rejected the constitutional
> claims on the merits, the showing required to
> satisfy § 2253(c) is straightforward: The
> petitioner must demonstrate that reasonable
> jurists would find the district court's
> assessment of the constitutional claims
> debatable or wrong."

*Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484).

The court has considered the issues raised by Hall, with respect to whether they satisfy the standard for issuance of a certificate of appeal, and determines that none meet that standard. The court therefore denies Hall a certificate of appealability.

**Conclusion**

In accordance with the foregoing, Hall's motion pursuant to 28 U.S.C. § 2255 (#237) is **DENIED**.  To the extent the court did not in this order discuss any particular assertion made by Hall in his petition, the court finds those contentions to be without merit. Hall's motion for an evidentiary hearing (#265) is **DENIED**.  Because the court has previously considered and granted in part Hall's motion for discovery, and allowed supplementation to the petition thereafter, Hall's motion to hold this matter in abeyance pending receipt of original discovery (#264) is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

DATED: This 3rd day of January, 2014.

*Howard D McKibben*
UNITED STATES DISTRICT JUDGE

31